ORIGINAL

Edward R. Hugo [Bar No. 124839]
James C. Parket [Bar No. 106149]
Thomas J. Moses [Bar No. 116002]
BRYDON HUGO & PARKER
135 Main Street, 20th Floor
San Francisco, CA 94105
Telephone: (415) 808-0300
Facsimile: (415) 808-0333

FILED
07 DEC 20 PM 2:14
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

Attorneys for Defendant
FOSTER WHEELER ENERGY CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BY FAX

| | |
|---|---|
| RODNEY C. BALL, individually and as Special Administrator of the Estate of ALFRED C. BALL; and REGINALD K. BALL, an individual,<br><br>Plaintiff(s),<br>vs.<br><br>UNION CARBIDE CORPORATION, a corporation; FOSTER WHEELER ENERGY CORPORATION, formerly known as FOSTER WHEELER CORPORATION, a corporation; GARLOCK, INC., a corporation; OWENS ILLINOIS, INC., a corporation; RAPID AMERICAN CORPORATION, a corporation; and DOES 1 through 150, inclusive,<br><br>Defendants. | (ASBESTOS) 07 CV 2392 W POR<br>U.S.D.C. __________<br><br>San Diego Superior Court Case No. 37-2007-00081444-CU-PO-CTL<br><br>DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL |

TO THE HONORABLE JUDGE OF UNITED STATES DISTRICT COURT:

Pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446, Defendant Foster Wheeler Energy Corporation ("Foster Wheeler"), gives notice of removal of an action filed against it in the Superior Court of the State of California, County of San Diego, to the United States District Court for the Southern District of California. In support, Foster Wheeler respectfully offers the following:

///

**Preliminary Matters**

1. On or about November 8, 2007, plaintiffs filed this lawsuit, entitled Rodney C. Ball, et al., Case No. 37200700081444CUPOCTL against Foster Wheeler and numerous other defendants in the Superior Court of the State of California, San Diego County. *See* Summons and Complaint attached hereto as Exhibit A.

2. Plaintiffs served Foster Wheeler with plaintiffs' Summons and Complaint on November 20, 2007. The Complaint appears to be limited to allegations that Alfred C. Ball was injured solely as a result of exposure to asbestos while serving in the United States Navy from 1955 to 1969. *Id.* at Exhibit A.

3. Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the first receipt by Foster Wheeler of plaintiffs' initial pleadings from which it ascertained that this case is removable. 28 U.S.C. § 1446(b).

**Nature Of The Case**

4. The case is based on plaintiffs' allegations that Alfred C. Ball's asbestos-related disease, specifically lung cancer, was caused by his exposure to asbestos dust and/or fibers.

5. Plaintiffs assert strict liability and negligence claims against Foster Wheeler and the other defendants based on various theories.

**Grounds For Removal**

6. This Notice of Removal is filed within thirty (30) days of plaintiffs' service of the Summons and Complaint. 28 U.S.C. § 1446(b). Foster Wheeler manufactured marine boilers and auxiliary equipment for use on Navy ships pursuant to contracts and specifications executed by the Navy. This is a unique case in that plaintiff specifically alleges exposure to Foster Wheeler equipment while he worked as a boiler technician in the Navy from 1955 to 1969. Foster Wheeler is one of only four defendants sued in this case, and is the only boiler manufacturer-defendant identified in this matter. Accordingly, it appears that plaintiffs are alleging that the decedent was exposed to a Foster Wheeler boiler while he served in the Navy. Thus, the basis for removal is that, in

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

the manufacture and sale of boilers and auxiliary equipment for the Navy, including all aspects of warnings associated with that equipment, Foster Wheeler was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7. Should plaintiffs file a motion to remand this case, Foster Wheeler respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time:

8. As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), Foster Wheeler has a federal defense to this action, *i.e.*, government contractor immunity from liability for injuries arising from any exposure to asbestos related to boilers and auxiliary equipment on board Navy vessels, insofar as they were constructed or repaired by Foster Wheeler. Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989).

9. One New York Federal Court has reviewed this issue as recently as February 2004. In *Isaacson v. Dow Chemical Company*, 304 F.Supp.2d 442 (E.D.N.Y. 2004), plaintiff originally sued the manufacturer of Agent Orange in New Jersey State Court. Defendants removed to federal court asserting, among other things, federal jurisdiction under the All Writs Act. *Id.* at 445. The New Jersey District Court found removal appropriate under the All Writs Act. *Id.* The case was then transferred to the Eastern District of New York by the Multidistrict Panel. *Id.* The Court of Appeals for the Second Circuit affirmed the district court's denial of remand finding jurisdiction appropriate under the All Writs Act. *Stephenson v. Dow Chemical Company*, 273 F.3d 19 (2d Cir. 2003). On review, the United States Supreme Court remanded the case finding that the All Writs Act alone would not support removal. *Dow Chemical Company v. Stephenson*, 539 U.S. 111 (2003). On remand from the Supreme Court, the Second Circuit determined that jurisdiction could not be grounded in the All Writs Act and remanded the case back to

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

the Eastern District of New York to determine if there was an alternative ground supporting federal jurisdiction. *Stephenson v. Dow Chemical Company,* 346 F.3d 19 (2d Cir. 2003). It is with that extensive procedural history that the district court examined the federal officer removal statute and found it sufficient to deny plaintiff's motion to remand. *Isaacson,* 304 F.Supp. at 445.

10. In reaching its conclusion, the *Isaacson* court discussed in detail the three elements necessary for removal under this statute. First, a defendant must demonstrate that it is a "person" within the meaning of the statute. *Id.* at 446. The definition of a "person" includes a corporation. *Id.* Second, the defendant must establish that the suit is "for any act under color of federal office," i.e., there is a causal connection between the charged conduct and asserted official authority. *Id.* (citations omitted). Causation exists if the predicate acts of the state court suit were undertaken while the person was acting as or under a federal officer, and the acts were under color of the relevant federal office. *Id.* Third, defendants must raise a colorable claim to a federal law defense. *Id.* As previously stated, a colorable claim to a federal defense can be predicated upon the federal government contractor defense. *Id.* at 449.

11. The second element requires a causal nexus between the defendant's actions under the federal officer and plaintiff's state court claims. *Id.* at 447. A substantial degree of direct and detailed federal control over defendant's work is required. *Id.* What constitutes sufficient federal control is often central to a court's decision to uphold removal or remand a case. Several courts have upheld removal because defendants were sued as a result of building products pursuant to military specifications. *See Crocker v. Borden,* 852 F.Supp. 1322 (E.D.La. 1994)(holding that removal was proper for Westinghouse because its marine turbines were manufactured pursuant to Navy specifications); *see also, Pack v. AC and S, Inc.,* 838 F.Supp. 1099 (D.Md. 1993)(holding that removal was proper for Westinghouse because the government had extensive control over the manufacture of turbines, even specifying the type of asbestos cloth). Not all courts agree, however, on the amount of federal control necessary to uphold removal

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

under this statute.

12. Certain courts have not always viewed this issue consistently. Prior to the *Isaacson* case, the Eastern District Court of New York remanded a similar matter involving Agent Orange. In *Ryan v. Dow Chemical Company*, 781 F.Supp. 934, 950 (E.D.N.Y. 1992), the district court remanded the case because it found that the control by the government was not sufficient to meet the requirements of section 1442(a)(1). The district court reasoned that the government sought only to buy a ready-to-order herbicide from the defendant and did not cause or control the production of the unwanted byproduct, dioxin, which was the alleged cause of the injuries. *Id.*

13. In discussing *Ryan*, the *Isaacson* court acknowledged that it was a contradictory decision. *Isaacson*, 304 F.Supp. at 445. It declared, however, that the *Ryan* decision was "no longer persuasive" and went on to discuss Fifth Circuit cases that specifically rejected the *Ryan* conclusion. *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 392 (5th Cir. 1998)(holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute); *see also, Miller v. Dow Chemical Company*, 275 F.3d 414, 417 (5th Cir. 2001)(also holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute). The *Isaacson* court denied remand based on facts that were almost identical to those in *Ryan*. The *Isaacson* court concluded that the government ordered specifications differed from the specifications for the defendants' commercial application of the product. *Isaacson, supra* at 450. In addition, the method of warning and application was completely in the government's hands. *Id.* Finally, the government had full knowledge of the dioxin "problem" inherent in the production of Agent Orange. *Id.* These factors demonstrated the control with which the government operated and, thus, warranted a different holding than *Ryan*. *Id.*

14. This analysis also applies to "failure to warn" cases where "there is evidence that the government was involved in the decision to give, or not to give, a warning." *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 438 (5th Cir.) *cert. denied* 531 U.S.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

919 (2000). The Court of Appeals for the Fifth Circuit has made it clear that the government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the manufacturer warned the government as to any product hazards known by the manufacturer but unknown by the government. *Kerstetter*, 210 F.3d at 438.

15. As stressed in *Kerstetter*, "[t]he government need not prepare the specifications to be considered to have approved them." *Id.* at 435. The only material issue is whether the manufacturer's designs and specifications were subjected to "substantial review" rather than a mere "rubber stamp" approval. *Id.* While this determination is necessarily fact specific, "substantial review" has plainly been shown upon evidence of a "`continuous back and forth' between the contractor and the government." *Id.* In this regard, "[t]he specifications need not address the specific defect alleged; the government need only evaluate the design feature in question." *Id.* Once again, applying these general principles to "failure to warn" claims, the fact that governmental specifications or regulations did not specifically preclude the exact warning desired by the plaintiff does not take a "failure to warn" claim outside the scope of the government contractor defense so long as the government was involved generally as to the issue of product warnings (or specifically approved the warnings provided by the contractor) and was generally aware of the hazard in question. *Id.* at 438. Stated another way, "[i]nadequacy [of a warning] is not an issue when it is the government's warning in the first place." *Id.* at 438.

16. The present case is substantially similar to *Kerstetter, supra*. As explained by J. Thomas Schroppe:

> The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers...The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

> in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers and economizers only to the extent directed by the Navy.
>
> Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

*See* Affidavit of J. Thomas Schroppe attached hereto as Exhibit B at ¶¶ 21 and 22. Thus, the presence or absence of warnings regarding Foster Wheeler equipment was strictly controlled by the Navy - and a clear basis for removal exists under § 1442(a)(1).

17. In further support of the removal, Foster Wheeler provides the Affidavit of Admiral Ben J. Lehman, U.S. Navy, Ret. *See* Affidavit of Admiral Lehman attached hereto as Exhibit C. Admiral Lehman joined the Navy in 1942 and worked as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1054. *Id.* at ¶ 1. During his tenure in the Navy and as Ship Superintendent, Admiral Lehman was personally involved with the supervision and oversight of ship alterations and equipment over hauls at the Brooklyn Navy Yard. *Id.* at ¶ 3. Admiral Lehman states in his Affidavit the Navy controlled every aspect of the design and manufacture of equipment intended for installation on Navy vessels and that the Navy could not, and did not, permit its contractors to implement changes from military specifications. *Id.* at ¶¶ 2 and 3. He further states:

> The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

*Id.* at ¶ 14.

Clearly, the Schroppe and Lehman Affidavits support federal removal jurisdiction under 28 U.S.C. § 1442(a)(1) and the federal nexus to Foster Wheeler's actions has been established.

18. A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand. 28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer,* 423 U.S. 336 (1976). The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(1). *Willingham v. Morgan,* 395 U.S. 402, 405 (1960).

19. Foster Wheeler is not required to notify and obtain the consent of any other defendant in this action in order to remove plaintiffs' action as a whole under § 1442(a)(1). *See Torres v. CBS News,* 854 F.Supp. 245 (S.D.N.Y. 1994)

20. As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon Foster Wheeler are being filed with this Notice of Removal.

**Conclusion**

21. Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(1) because Foster Wheeler was acting under an officer or agency of the United States.

///

///

///

///

///

///

///

BRYDON HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

THEREFORE, Foster Wheeler, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action for trial from the Superior Court of the State of California, County of San Diego, on this 20th day of December, 2007.

Dated: December 19, 2007

Respectfully submitted,
BRYDON HUGO & PARKER

By: [signature]

Edward R. Hugo
James C. Parker
Thomas J. Moses
Attorneys for Defendant
FOSTER WHEELER LLC

4801-0000

EXHIBIT A

11·20·07 2:45p

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
UNION CARBIDE CORPORATION, a corporation;

[See 'Additional Parties Attachment' form]

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
RODNEY C. BALL, individually and as Special Administrator of the Estate of ALFRED C. BALL; and REGINALD K. BALL, an individual

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION
2007 NOV -8 P 3:39
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.**

**There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.**

***Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.***

***Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.***

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SAN DIEGO COUNTY SUPERIOR COURT
330 West Broadway
San Diego, CA 92101

CASE NUMBER: *(Número del Caso):* 37-2007-00081444-CU-PO-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
FREDERICK SCHENK / CASEY, GERRY, SCHENK, FRANCAVILLA, BLATT & PENFIELD LLP
110 Laurel Street, San Diego, CA 92101 / (619) 238-1811

DATE: NOV 0 8 2007 *(Fecha)* Clerk, by *(Secretario)* E. SCHEITT, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Foster Wheeler Energy Corporation, a corporation formerly known as Foster Wheeler Corporation, a corporation

under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*: 11·20·07



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

SUMMONS

Code of Civil Procedure §§ 412.20, 465

American LegalNet, Inc. | www.USCourtForms.com

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BALL, et al. v. UNION CARBIDE CORPORATION, et al. | |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff ☑ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

FOSTER WHEELER ENERGY CORPORATION, a corporation, formerly known as FOSTER WHEELER CORPORATION, a corporation; GARLOCK, INC., a corporation; OWENS ILLINOIS, INC., a corporation; RAPID AMERICAN CORPORATION, a corporation; and DOES 1 through 150, inclusive



Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

American LegalNet, Inc.
www.FormsWorkflow.com

CASEY, GERRY, SCHENK,
FRANCAVILLA, BLATT & PENFIELD, LLP
FREDERICK SCHENK, Bar No. 086392
JESSICA E. KLARER, Bar No. 249212
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Attorneys for Plaintiffs

FILED
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION
2007 NOV -8 P 3:39
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| RODNEY C. BALL, individually and as Special Administrator of the Estate of ALFRED C. BALL; and REGINALD K. BALL, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>UNION CARBIDE CORPORATION, a corporation; FOSTER WHEELER ENERGY CORPORATION, a corporation, formerly known as FOSTER WHEELER CORPORATION, a corporation; GARLOCK, INC., a corporation; OWENS ILLINOIS, INC., a corporation; RAPID AMERICAN CORPORATION, a corporation; and DOES 1 through 150, inclusive,<br><br>Defendants. | CASE NO 37-2007-00081444-CU-PO-CTL<br><br>COMPLAINT FOR DAMAGES (WRONGFUL DEATH) |

COMES NOW the plaintiffs and for causes of action against defendants, and each of them, complain and allege as follows:

1. On June 15, 2007, after the foregoing cause of action arose in his favor ALFRED C. BALL, (hereinafter referred to as "Plaintiffs' Decedent") died. ALFRED C. BALL, deceased, would have been the plaintiff in this action had he lived.

2. Plaintiff RODNEY C. BALL is one of the surviving children and an heir of the Estate of the plaintiffs' decedent. Plaintiff REGINALD K. BALL, an individual is the other surviving child of plaintiffs' decedent and heir to the Estate of plaintiffs' decedent.

3. Plaintiff RODNEY C. BALL will be appointed Special Administratrix of the Estate of ALFRED C. BALL, deceased, by the Superior Court of California, County of San Diego.

4. Plaintiff RODNEY C. BALL will be appointed qualified and acting Special Administrator of the Estate of ALFRED C. BALL, and brings this action for the benefit of all survivors, heirs at law and next of kin of the decedent. Plaintiff brings this action as specified in Section 377(b) of the Code of Civil Procedure on behalf of the surviving heirs of ALFRED C. BALL, deceased.

5. The true names and/or capacities, whether individual, corporate, associate, governmental or otherwise, of defendants, DOES 1 through 150, inclusive, are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitious names, and when the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and thereupon allege upon such information and belief, that each defendant designated herein as DOE is responsible negligently, or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to Plaintiffs' Decedent, as hereinafter alleged.

6. Plaintiffs are informed and believe, and thereupon allege upon such information and belief, that at all times mentioned herein, Defendants, and each of them, were the agents, servants, employees, and/or joint venturers of their co-defendants and were, as such, acting within the scope, course, and authority of said agency, employment, and/or joint venture; and that defendants, and each of them, ratified and approved the acts of his agents and employees; and that each defendant was responsible in some manner for the injuries to Plaintiffs' Decedent.

7. Plaintiffs are informed and believe and thereupon allege, upon such

information and belief, that at all times mentioned herein, defendants UNION CARBIDE CORPORATION, a corporation; FOSTER WHEELER ENERGY CORPORATION, a corporation, formerly known as FOSTER WHEELER CORPORATION, a corporation; GARLOCK, INC., a corporation; OWENS ILLINOIS, INC., a corporation; RAPID AMERICAN CORPORATION, a corporation; and DOES 1 through 150, inclusive, are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some state of the United States of America, or some foreign jurisdiction, and that said defendants were and are authorized to and are doing business in the State of California, and that said defendants have regularly conducted business in the State of California.

8. Additionally, decedent ALFRED C. BALL was exposed to asbestos-containing products manufactured by other asbestos manufacturers however, these manufacturers and/or suppliers are not being named as defendants at this time because plaintiffs understand that such action would risk contempt of the respective bankruptcy courts.

## FIRST CAUSE OF ACTION

(Negligence)

9. Plaintiffs reallege, as though fully set forth at length, and incorporate herein by this reference, each and every allegation set forth above.

10. During the time periods relevant hereto, Plaintiffs' Decedent, ALFRED C. BALL, served in the United States Navy from 1955 to 1969 as an engineer and boiler technician.

11. While serving in the United States military Plaintiffs' Decedent was exposed to the toxin asbestos, for a substantial length of time, by one or more of the products researched, tested, manufactured, fabricated, designed, assembled, distributed, leased, bought, sold, installed, inspected, serviced, repaired, marketed, advertised, distributed, used, and/or handled by each defendant. Such exposure was reasonably foreseeable to Defendants.

12. Within the statutory time period, Plaintiffs' Decedent learned, as a direct and proximate result of his exposure to Defendants' asbestos and asbestos-containing products in the above-described manner, that asbestos and asbestos fibers, particles, and substances, were lodged in his lungs and body; that he had sustained serious, permanent injuries to his body, lungs, and respiratory system; and that he was suffering from a malignant, asbestos-related lung cancer whose known cause is exposure to asbestos and/or asbestos-containing products. Due to Plaintiffs' Decedent's exposure to each defendant's asbestos and asbestos-containing products, Plaintiffs' Decedent died on June 15, 2007, and the exposure to Defendants', and each of their asbestos and asbestos-containing products was a substantial factor in causing the death of Plaintiffs' Decedent.

13. During the time of Plaintiffs' Decedent's employment with his aforementioned employers, Plaintiffs' Decedent was exposed to asbestos from one or more of the products researched, tested, manufactured, fabricated, designed, assembled, distributed, leased, bought, sold, installed, inspected, serviced, repaired, marketed, advertised, distributed, used, and/or handled by defendants, and each of them, including, but not limited to insulation products containing asbestos.

14. As a result of the aforementioned exposure to one or more of the asbestos-containing products researched, tested, manufactured, fabricated, designed, assembled, distributed, leased, bought, sold, installed, inspected, serviced, repaired, marketed, advertised, distributed, used, and/or handled by defendants, and each of them, the toxin asbestos entered Plaintiffs' Decedent's body. .

15. As a direct and proximate result of his exposure to asbestos, herein above described, Plaintiffs' Decedent sustained serious, permanent injuries to his body, lungs, and respiratory system from which he ultimately died on June 15, 2007.

16. Each defendant knew, or should have known in the exercise of reasonable care, that the asbestos-containing products which they researched, tested, manufactured, fabricated, designed, assembled, distributed, leased, bought, sold, installed, installed, supplied, inspected, serviced, repaired, marketed, advertised, distributed, used, and/or

handled were, and are, harmful to the body, lungs, respiratory system and cardiovascular system of persons installing, handling, and/or using them; of persons in the immediate vicinity of said products' installation, use, and/or handling; and of persons interacting and/or living with persons that at have asbestos particulates on their clothing.

17. At all times mentioned herein, defendants, and each of them, negligently and carelessly researched, tested, manufactured, fabricated, designed, assembled, distributed, leased, bought, sold, installed, supplied, inspected, serviced, repaired, marketed, advertised, distributed, used, and/or handled the products containing asbestos and asbestos fibers, particles, and substances that Plaintiffs' Decedent was exposed to, that became lodged in Plaintiffs' Decedent's lungs and body, and that ultimately caused Plaintiffs' Decedent's death.

18. Plaintiffs' Decedent's injuries and death were directly and proximately caused by the negligent failure of each defendant to take reasonable care to warn, and/or by each defendant's inadequate warning to Plaintiffs' Decedent, of the danger and harm to which he was exposed while handling, using, working with, being in the vicinity, or bringing home via clothing worn at the time of work, each defendant's asbestos and/or asbestos-containing products; the negligent failure of each defendant to coat, treat, encapsulate, or otherwise process, package, and label said asbestos and asbestos products so as to prevent the generation of the deleterious and harmful particulates and dust and to warn those working with, or in the vicinity of, each defendant's asbestos and/or asbestos-containing products of the dangers of these products; and by the negligent failure of Defendants, and each of them, to specify, recommend, supply, manufacture, fabricate, design, assemble, distribute, lease, buy, sell, install, market, advertise, distribute, use, and/or handle readily available substitutes which did not pose the danger to human health.

19. As a direct and proximate result of the conduct of the defendants, and each of them, and the injuries caused thereby as aforesaid, Plaintiffs' Decedent was hurt and injured in his health, strength, and activity, sustaining serious, permanent injuries to his person, body, lungs, respiratory, and cardiovascular systems from which he ultimately died

on June 15, 2007. Plaintiffs are informed and believe, and thereon allege, that said injuries and Plaintiffs' Decedent's death are general damages of a sum which has yet to be ascertained.

20. As a direct and proximate result of the aforementioned conduct of the defendants, and each of them, and the injuries caused thereby as aforesaid, Plaintiffs' Decedent was hurt, injured in his health, strength, and activity, and ultimately died. Each aforementioned result of Defendants' conduct compelled Plaintiffs' Decedent to employ the services of hospitals, surgeons, physicians, nurses, and the like, to care for and treat Plaintiffs' Decedent, and to incur medical, hospital, professional, and incidental expenses. Plaintiffs are also informed and believe, and thereupon allege, that by reason of Plaintiffs' Decedent's said injuries and death, Plaintiffs will necessarily incur additional like expenses to be stated according to proof pursuant to California Code of Civil Procedure section 425.10.

**SECOND CAUSE OF ACTION**

(Strict Liability)

21. Plaintiffs reallege as though fully set forth at length, and incorporate herein by this reference, each and every allegation set forth above.

22. At all times mentioned herein, Defendants, and each of them, researched, tested, manufactured, designed, labeled, distributed, advertised, marketed, warranted, inspected, repaired, installed, offered for sale and/or sold to the public, to Plaintiffs' Decedent's employers, and/or to employees working in the vicinity of Plaintiffs' Decedent, asbestos and/or asbestos-containing products, with the knowledge that said products would be used and/or handled by, or in the vicinity of, Plaintiffs' Decedent, and/or persons similarly situated to Plaintiffs' Decedent, without any knowledge of said products' defects or inherent danger, and without any inspection of said products for defects.

23. In the course and scope of his employment, Plaintiffs' Decedent used, handled, and/or was exposed to each defendant's asbestos and/or asbestos-containing products without receiving any warning from said defendants that said products were

defective in nature, or that the exposure to, or utilization of, said products was dangerous to Plaintiffs' Decedent's health.

24. At all times herein mentioned and throughout the period of Plaintiffs' Decedent's use and exposure to asbestos-containing products manufactured, fabricated, designed, assembled, distributed, leased, bought, sold, installed, marketed, advertised, and/or distributed by defendants, and each of them, for ultimate use by, or in the vicinity of, Plaintiffs' Decedent, said products were defective and unsafe for their intended purposes because each of them lacked any warning of the inherent dangers contained in the use of, and/or exposure to, said products; because said products were not coated, treated, encapsulated, processed, or packaged, so as to prevent said products from being unsafe and unreasonably dangerous for their intended purpose; and because no substitute ingredient for asbestos was used so as to prevent said products from being unsafe and/or unreasonably dangerous for their intended purpose.

25. As a direct and proximate result of the above-described conduct by defendants, and each of them, Plaintiffs' Decedent suffered severe and permanent injuries to his person, and death. These allegations are incorporated herein and made a part hereof by reference.

26. With the knowledge of the hazards of exposure to asbestos, said defendants opted to manufacture, fabricate, design, assemble, distribute, lease, buy, sell, install, inspect, service, repair, market, advertise, use, and/or handle said asbestos and/or asbestos-containing products without attempting to protect Plaintiffs' Decedent, or persons similarly situated to Plaintiffs' Decedent, from the high risks of injury and death caused by exposure to each defendant's asbestos and/or asbestos-containing products. Additionally, said defendants opted to carry-out said conduct without attempting to warn Plaintiffs' Decedent, or persons similarly situated to Plaintiffs' Decedent, of said risks. Said defendants failed to reveal their knowledge of said risks, and intentionally, consciously, and/or actively concealed and suppressed said knowledge from members of the general public, Plaintiffs' Decedent's employers, and other members of the general public, thus

impliedly representing to them that Defendant's asbestos and/or asbestos-containing products were safe for reasonably, foreseeable use, while knowing said implied representations to be false, and while consciously disregarding the rights and/or safety of Plaintiffs' Decedent, Plaintiffs' Decedent's employers, and other members of the general public. Said despicable conduct of Defendants was motivated by Defendants' financial interests in continuing to recommend, supply, manufacture, fabricate, design, assemble, distribute, lease, buy, sell, install, market, advertise, distribute, use, and/or handle said asbestos and/or asbestos-containing products without interruption. In pursuance of said financial motivation, said defendants consciously disregarded the safety of Plaintiffs' Decedent and other members of the general public, and were consciously willing to permit said asbestos and/or asbestos-containing products to cause injury to said users and bystanders, including Plaintiffs' Decedent.

27. Because the above-referenced despicable conduct of said defendants was, and is, willful, malicious, outrageous, and in conscious disregard and indifference to the safety of Plaintiffs' Decedent, and other persons similarly situated to Plaintiffs' Decedent, within the meaning of Civil Code section 3294, Plaintiffs, for the sake of example, and by way of punishing said defendants, seek punitive damages according to proof.

**THIRD CAUSE OF ACTION**

(Breach of Express Warranty of Fitness
for a Particular Purpose)

28. Plaintiffs reallege, as though fully set forth at length, and incorporate herein by this reference, each and every allegation set forth above.

29. Defendants, and each of them, expressly warranted to Plaintiffs' Decedent that their asbestos, and/or asbestos-containing products, were reasonably fit for their intended use as insulation in shipbuilding, and related industries, without endangering human life.

30. Defendants, and each of them, breached the above-described express warranty in that said substances were defective and said substances' defects permitted

and/or caused said substances to cause lung disease to Plaintiffs' Decedent who used, and/or was in the vicinity of, said substances in a manner that was reasonably foreseeable by each defendant.

31. Plaintiffs' Decedent relied upon the express warranties and representations made by defendants, and each of them, regarding the reasonable fitness of asbestos and/or asbestos-containing products. Based on these false warranties and representations, Plaintiffs' Decedent was exposed to asbestos and thereby damaged by it as previously alleged.

32. As a direct and proximate result of the above-described breach of express warranty by Defendants, and each of them, Plaintiffs' Decedent suffered the injuries, damages, and death previously alleged.

33. As a direct and proximate result of the aforementioned conduct of the Defendants, and each of them, and the injuries and death caused thereby as aforesaid, Plaintiffs' Decedent was hurt and injured in his health, strength, and activity and he was compelled to, and did, employ the services of hospitals, surgeons, physicians, nurses, and the like, to care for and treat him, and did incur medical, hospital, professional, and incidental expenses.

WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as follows:

1. General damages for personal injury according to proof, in an amount within the jurisdictional limits of this court;

2. Special damages in an amount according to proof;

3. Punitive damages as to the Second Cause of Action in an amount to be proven at time of trial.

///

///

///

///

4. Costs of suit herein incurred;

5. Other and further relief as the court may deem proper.

DATED: 11/8/07

CASEY, GERRY, SCHENK,
FRANCAVILLA, BLATT & PENFIELD, LLP

By: [signature]
FREDERICK SCHENK
Attorneys for Plaintiffs

CASEY, GERRY, SCHENK,
FRANCAVILLA, BLATT & PENFIELD, LLP
FREDERICK SCHENK, Bar No. 086392
JESSICA E. KLARER, Bar No. 249212
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Attorneys for Plaintiffs

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN DIEGO**

RODNEY C. BALL, individually and as Special Administrator of the Estate of ALFRED C. BALL; and REGINALD K. BALL, an individual,

Plaintiffs,

v.

UNION CARBIDE CORPORATION, a corporation; FOSTER WHEELER ENERGY CORPORATION, a corporation, formerly known as FOSTER WHEELER CORPORATION, a corporation; GARLOCK, INC., a corporation; OWENS ILLINOIS, INC., a corporation; RAPID AMERICAN CORPORATION, a corporation; and DOES 1 through 150, inclusive,

Defendants.

CASE NO.

STATEMENT OF CLAIM FOR DAMAGES

Plaintiffs make claim against defendants, and each of them, for general damages in the amount of $1,000,000.00, plus medical expenses, loss of earnings and earning capacity, and all other incidental expenses as shown according to proof, and for such other and further relief as the Court deems proper.

///

Additionally, plaintiff claims punitive damages in the amount of three million dollars ($3,000,000.00).

DATED: 11/7/07

CASEY, GERRY, SCHENK,
FRANCAVILLA, BLATT & PENFIELD, LLP

By: [signature]
FREDERICK SCHENK
Attorneys for Plaintiffs

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**<br>STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY AND ZIP CODE: San Diego, CA 92101<br>BRANCH NAME: Central<br>TELEPHONE NUMBER: (619) 685-6145 | |
| PLAINTIFF(S) / PETITIONER(S): Rodney C Ball Individually and as Special Administrator of the State of Alfred C Ball et.al. | |
| DEFENDANT(S) / RESPONDENT(S): Union Carbide Corporation et.al. | |
| RODNEY C BALL INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR OF THE STATE OF ALFRED C BALL VS. | |
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2007-00081444-CU-PO-CTL |

Judge: Jay M. Bloom

Department: C-70

**COMPLAINT/PETITION FILED:** 11/08/2007

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2007-00081444-CU-PO-CTL CASE TITLE: Rodney C Ball individually and as Special Administrator of thi

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial.

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non-binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation; $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827<br>BRANCH NAME: Central | *FOR COURT USE ONLY* |
| PLAINTIFF(S): Rodney C Ball Individually and as Special Administrator of the State of Alfred C Ball et.al. | |
| DEFENDANT(S): Union Carbide Corporation et.al. | |
| SHORT TITLE: RODNEY C BALL INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR OF THE STATE OF ALFRED C BALL VS. UNION CARBIDE CORP | |
| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221)** | CASE NUMBER:<br>37-2007-00081444-CU-PO-CTL |

Judge: Jay M. Bloom Department: C-70

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

- ☐ Court-Referred Mediation Program
- ☐ Private Neutral Evaluation
- ☐ Private Mini-Trial
- ☐ Private Summary Jury Trial
- ☐ Private Settlement Conference with Private Neutral
- ☐ Court-Ordered Nonbinding Arbitration
- ☐ Court-Ordered Binding Arbitration (Stipulated)
- ☐ Private Reference to General Referee
- ☐ Private Reference to Judge
- ☐ Private Binding Arbitration
- ☐ Other (specify): ______

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) ______

Alternate: (mediation & arbitration only) ______

Date: ______ Date: ______

______ ______

Name of Plaintiff Name of Defendant

______ ______

Signature Signature

______ ______

Name of Plaintiff's Attorney Name of Defendant's Attorney

______ ______

Signature Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

**IT IS SO ORDERED.**

Dated: 11/08/2007 ______

JUDGE OF THE SUPERIOR COURT

**AFFIDAVIT OF J. THOMAS SCHROPPE IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL**

I, J. Thomas Schroppe, being under penalty of perjury, declare and say:

1. I am a 1962 graduate of the New York State Maritime College with a degree in Marine Engineering. For three months in 1962, I worked as a Third Assistant Engineer for American Export Lines. I began my career at Foster Wheeler in 1962 as a Proposal Engineer in the Marine Department. As a Proposal Engineer, I was responsible for taking shipyard specifications and designing a boiler to meet the thermal performance and physical requirements of those specifications. In 1967, I became the Manager of the Proposal Department and reviewed all proposals. In 1969, I was promoted to Vice President of Engineering at which point I supervised both proposal and contract execution activities. From 1975 to 1982, I was President of Foster Wheeler Boiler Corporation. In 1982, I became Managing Director of Foster Wheeler U.K. From 1984 to my retirement in 1999, I was Executive Vice President of Foster Wheeler Power Systems.

2. I am personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary equipment because I was personally involved in such contracts at all the various stages of development, from inquiry and bid through production, testing, and sea trials and, ultimately, acceptance.

3. I submit this affidavit to attest to the degree of involvement, supervision, direction and control exercised by the U.S. Navy and its authorized agents and officers in connection with procurement contracts with Foster Wheeler for equipment to be installed aboard U.S. Naval vessels. The following paragraphs describe the contract process from the perspective of Foster Wheeler as the vendor, as well as the levels of interaction between Foster Wheeler and the Navy agents and personnel through the various stages of a given contract.

4. Foster Wheeler furnished and fabricated marine propulsion boilers and related auxiliary systems for U.S. Navy, Maritime Commission, and Coast Guard ships under contract between Foster Wheeler and the shipyards and/or the United States Navy Department and its authorized agencies, officers and personnel (hereafter collectively referred to as the "Navy").

5. The Navy was responsible for all phases of the design of a vessel, which was accomplished by the Naval architect. Specifically, the Naval architect would prepare the ship design which involved the entire vessel, including the machinery space, and all performance requirements. In general, the ship design for any given class of ship would be contained in a Ship Specification ("Ship Spec") which covers all aspects of the vessel including the machinery space. As it relates to the boiler, the Ship Spec would cover all boiler operating criteria, performance requirements, and maximum physical dimension of the boiler(s). In general, the Ship Spec was written and prepared by the naval architect and approved by the Navy and, in the course of its projects with the Navy, Foster Wheeler was required to design, fabricate and furnish equipment which complied strictly with the requirements in the Ship Spec.

6. In addition to the Ship Spec, Foster Wheeler was also obligated to comply with Military Specifications ("Mil Specs") which cover all specific components of the boiler, including

accessories, subcomponents, and materials required to fabricate the boilers and its components.

7. The normal process by which Foster Wheeler sold marine boilers and economizers to the Navy first involved receipt and response to an inquiry from either BuShips (Bureau of Ships) or the shipyard, depending on the Navy's procurement process. The boiler inquiry would be assigned to a proposal engineer at Foster Wheeler's marine department who would review the inquiry, which consisted of the Ship Spec and the associated drawings, for the performance requirements and size limitations of the boiler.

8. The performance requirements are contained in the specifications, namely MIL-B18381 and the Ship Spec, which must be followed. I must point out that deviations from these specs were not acceptable as the boiler is just one piece of the entire power plant which was designed by BuShips or by a designated naval architecture firm such as Gibbs and Cox. In addition, the Foster Wheeler proposal engineer was aware that these requirements would be tested during the sea trials, so all calculations had to precisely conform with the Ship Spec.

9. During the proposal phase, Foster Wheeler would prepare design drawings and related materials in conformance with the Ship Spec (which included performance specs and size limitations) and other requirements contained in MIL-B-18381 which was the Mil Spec pertaining to Naval propulsion boilers. I am personally familiar with the MIL-B-18381 as I saw it and referred to it throughout my career at Foster Wheeler. Foster Wheeler would prepare a proposal drawing and proposal specification that would outline the design and scope of material and equipment contained in the proposal. The boiler proposal submitted by Foster Wheeler would incorporate the specific requirements set forth in the Ship Spec and MIL-B18381.

10. Approximately half way through the proposal process, information is forwarded to Foster Wheeler's estimating department to start to prepare an estimate of the boiler cost. In parallel, the proposal engineer starts calling vendors to obtain quotes for the various boiler accessories such as burners, sootblowers, gage glasses, safety valves, etc. All Navy approved vendors were asked to provide a quotation for the material in accordance with the Mil Spec covering their equipment or product.

11. The finished boiler proposal consisted of an approximately 25 page booklet, a proposal drawing and an offering letter to the entity requesting a proposal so stating that the offering was in accordance with the Ship Spec and all required Mil Specs.

12. The boiler proposal would be reviewed by the shipyard with the understanding that the proposed design, prepared specifically for the Navy in accordance with the Ship Spec. at issue, conformed to all appropriate specifications stated above. Once final price negotiations were complete, the contract was awarded to Foster Wheeler.

13. The boiler specifications would provide detailed requirements for the boiler and economizer and would always reference the boiler Mil Spec (MIL-B-18381) which dictated very specific material requirements such as:

(a) Boiler, superheater and economizer tubes: Type of tube, tube diameter, tube thickness, material, and tensile strength.

(b) Refractory and Insulation: Specification identified the material, arrangement of various bricks and insulating materials on various boiler walls and provided specific Mil Specs for each type of insulating/refractory material.

(c) Boiler accessories: All accessories applied to the boiler, such as burners, safety valves, soot blowers, must conform to a specific Navy Mil Spec for each such component.

14. At receipt of an order the same Foster Wheeler proposal engineer is assigned the project as a contract engineer which will entail a more detailed recalculation of the thermal performance for the boiler. In addition, calculations of all the pressure drops, design of drum de-superheaters and final selection of all boiler accessories are made. All this work will be double checked by the head of engineering. In parallel, the contract engineer will commence discussions with the contract design department who will make all the drawings required for both manufacture, for submission to the shipyard and the Navy for review and approval. Foster Wheeler would not commence production of the boilers until the Navy issued final approval of these contract drawings. The approved drawings prepared during this phase would eventually be incorporated into the technical manuals.

15. The contract design department also provides the material requisitions to the purchasing department so they may procure materials in accordance with Mil Specs. With regard to procurement of insulating and refractory material, the specific requirements for insulation and refractory items are listed in MIL-B-18381, which then references additional Mil Specs for each specific type of refractory/insulating material required. Foster Wheeler's procurement process would involve the purchasing department contacting the vendor and requesting a quotation for the material. The Foster Wheeler purchase order would reference the appropriate Mil Spec for each item shipped. The vendor, in turn, would supply materials that conformed to the Mil Spec and ship it directly to the shipyard. Finished products such as burners, sootblowers, and all refractory and insulating materials, etc. are shipped direct to the shipyard so they may be incorporated into the final boiler erection. Upon arrival at the shipyard, there would be a receipt inspection to ensure what was on bill of materials was delivered.

16. During manufacture of the boiler, a Navy resident inspector was present at Foster Wheeler's shops. The Navy inspector would review all fabrication processes, welding procedures, pressure part welding, and all weld x-rays for conformity to Mil Specs. The inspector would also ensure that all materials used at this stage, e.g., steel, flanges, tubes, etc., conformed to applicable Mil Specs. All manufacturing was performed to drawings which had been reviewed and approved by the Navy.

17. Once individual components (e.g., headers, tubes, pressure parts) were manufactured, inspected by a Foster Wheeler quality control inspector, and inspected and stamped with approval by the resident Navy inspector, the materials/components were moved to the shipping area. At this point, the boiler fabrication was complete, though the boilers were in a "knocked down" condition (unassembled) for shipment. The economizers were always shop assembled since they could be shipped by rail. The boiler components and related materials were wrapped and/or boxed in accordance with Mil Specs relating to packaging and shipment of materials, which is also referred to in Mil Spec MIL-B-18381.

18. The knocked down boilers are then shipped from Foster Wheeler's facility to the shipyard for assembly. For those not familiar with Naval propulsion boilers, they are simply too large and heavy to be shipped assembled. The assembly is done by shipyard workers with a Foster Wheeler employee on site to interpret drawings and answer questions that may arise during the assembly process. Resident Navy inspectors also witness the boiler assembly process.

19. A critically important inspection item is the hydrostatic test put on the boiler after complete assembly of the pressure parts. This test is a water pressure test of the boiler at 50% over the boiler design pressure. At this point, leaks, even small ones, are not acceptable to the Navy. Formal written acceptance at this stage by the Navy inspector is a requirement. The boilers now sit idle in the ship as the remainder of the engine room and the balance of the ship are being completed. It is at this point that all the engine room piping is connected to the various connections on the boiler. Following the piping tests (shipyard responsibility) the shipyard insulates all piping up to the boiler casings.

20. Upon completion of the vessel by the shipbuilder, dock trials start to test the various machinery systems in the engine room. The boilers are run at low power since the main turbine cannot be run very fast at the dock because any higher powers would tear the ship loose from the pier. Full power testing is done during sea trials where all aspects of the boiler performance are thoroughly tested. Foster Wheeler would send a service engineer to witness these tests and answer any questions which may arise. Foster Wheeler frequently sent the contract engineer on the first ship of a new class to obtain first-hand data on the boiler performance. Sea Trials were performed on every ship and formal approval by the head Navy inspector was required. Any punch list items which were identified had to be corrected before final acceptance of the boilers.

21. In addition to the above design, manufacture and testing there remains an obligation by Foster Wheeler to provide technical manuals for the boilers and economizers furnished in a given Navy contract. The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers such as engineering drawings, test reports and other technical data that could be used as needed by shipboard engineering officer during the life of the equipment. The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers and economizers only to the extent

directed by the Navy.

22. Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 27 day of March, 2007 at Newark, New Jersey.

J. Thomas Schroppe

THE STATE OF NEW JERSEY

ESSEX COUNTY )

Personally appeared before me this day of March, 2007, J. Thomas Schroppe, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this 27th day of March, 2007. My commission expires 4/1/2007

Notary Public

HEDWIG BACHLER
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 1, 2007

EXHIBIT C

# AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1. I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S. Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I attended the College of the City of New York. I had been a "student engineer" at the Mack Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College of the City of New York in order to complete my course work there and then enter military service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S. Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

2. I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

3. During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

4. The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships: for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5. Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

5. The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

6. Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

7. These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8. The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9. The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

a. it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

b. it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

c. every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10. The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11. In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment. The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12. The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks, from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13. Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14. The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal acknowledge.

Executed this 12th day of July 2007.

On this 12 day of 07, 2007, before me, a Notary Public,

Josh Martin

MY COMMISSION EXPIRES August 28, 2010

JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-108087-5
MY APPT. EXPIRES AUGUST 28, 2010

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to Plaintiffs' counsel via Hand Delivery and all known counsel of record via regular mail on this 20th day of December, 2007.

**Via Hand Delivery**
Frederick Schenk, Esq.
CASEY, GERRY, SCHENK
FRANCAVILLA, BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, California 92101
(619) 238-1811
ATTORNEYS FOR PLAINTIFFS

All Known Defense Counsel (via regular mail)

UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 145768 - BH

December 20, 2007
14:17:06

Civ Fil Non-Pris
USAO #.: 07CV2392 CIVIL FILING
Judge..: THOMAS J WHELAN
Amount.: $350.00 CK
Check#.: BC# 7327

Total-> $350.00

FROM: CIVIL FILING
BALL V. FOSTER WHEELER ENERGY

JS 44
(Rev. 07/89)

# ORIGINAL
# CIVIL COVER SHEET

BY FAX

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I. (a) PLAINTIFFS**
RODNEY C. BALL, individually and as Special Administrator of the Estate of Alfred C. Ball; and REGINALD K. BALL, an individual

**DEFENDANTS**
FOSTER WHEELER ENERGY CORPORATION

07 DEC 20 PM 2:13
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

'07 CV 2392 W POR

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ______
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ______
(IN U.S. PLAINTIFF CASES ONLY)
DEPUTY
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Frederick Schenk
CASEY, GERRY, SCHENK, FRANCAVILLA, BLATT
110 Laurel Street
San Diego, CA 92101
(619) 238-1811

ATTORNEYS (IF KNOWN)
James c. Parker
BRYDON HUGO & PARKER
135 Main Street, 20th Floor
San Francisco, CA 94105
(415) 808-0300

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. section 1446(b)

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

PERSONAL INJURY
- [ ] 362 Personal Injury - Medical Malpractice
- [ ] 365 Personal Injury - Product Liability
- [X] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

**SOCIAL SECURITY**
- [ ] 861 HIA (13958)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 400 State Reappointment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**CIVIL RIGHTS**
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights

**PRISONER PETITIONS**
- [ ] 510 Motion to Vacate Sentence

HABEAS CORPUS:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Conditions

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 Original Proceeding
- [X] 2 Removal from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 DEMAND $ 0.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE ______ Docket Number ______

DATE
December 20, 2007

SIGNATURE OF ATTORNEY OF RECORD
James C. Parker

PAID $350 12/20/07 DH RCPT# 145268

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)