FREDERICK SCHENK, Bar No. 086392
JESSICA E. KLARER, Bar No. 249212
**CASEY, GERRY, SCHENK,**
**FRANCAVILLA, BLATT & PENFIELD LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RODNEY C. BALL, individually and as Special Administrator of the Estate of ALFRED C. BALL; and REGINALD K. BALL, an individual,<br><br>Plaintiffs,<br>v.<br><br>UNION CARBIDE CORPORATION, a corporation; FOSTER WHEELER ENERGY CORPORATION, a corporation, formerly known as FOSTER WHEELER CORPORATION, a corporation; GARLOCK, INC., a corporation; OWENS ILLINOIS, INC., a corporation; RAPID AMERICAN CORPORATION, a corporation; and DOES 1 through 150, inclusive,<br><br>Defendants. | (ASBESTOS)<br><br>U.S.D.C. 07CV2392WPOR<br><br>San Diego Superior court Case No. 37-2007-00081444-CU-PO-CTL<br><br>DECLARATION OF FREDERICK SCHENK<br><br>RE: REPLY TO DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND<br><br>Motion Date: February 19, 2008<br>Dept.: D-7<br>Time: 10:30 am<br>Judge: Honorable Thomas J. Whelan<br>[No oral argument per local rules] |

I, FREDERICK SCHENK, declare:

1. I am an attorney licensed to practice law before all the courts of the State of California and am a partner of the law firm, Casey, Gerry, Reed & Schenk, the attorneys of record for plaintiffs herein.

2. The facts stated within this declaration are personally known to me and if

called as a witness in the above-entitled action, I could competently testify thereto.

3. I represent Rodney C. Ball and Reginald K. Ball in the above-entitled case.

4. Attached hereto as Exhibit A is a true and correct copy of excerpts from the deposition of Ben Lehman, dated December 23, 2005, in *Sweeney v. Saberhagen Holdings, Inc., et al.*, No. C05-16372 (W.D. Wash.).

5. Attached hereto as Exhibit B is a true and correct copy of excerpts from the deposition of Roger B. Horne, dated June 19, 2002, in *In Re: Federal-Mogul Global, Inc. v. Mathias*, No. 01-10578 (W.D. Tex.).

6. Attached hereto as Exhibit C is a true and correct copy of excerpts from the deposition of Thomas Keenan, dated January 25, 2006, in *Seymour v. Saberhagen Holdings, Inc., et al.*, No. C05-2145JCC (W.D. Wash.).

7. Attached hereto as Exhibit D is a true and correct copy of excerpts from trial testimony of Dr. Charles Cushing, dated December 8, 2006, in *Riggle v. Allis-Chalmers Corp., et al.*, No. 04-01018-L (Tex. Dist.).

8. Attached hereto as Exhibit E is a true and correct copy of correspondence between myself and Foster Wheeler defense counsel, Thomas Moses, dated December 19, 2007, in the above-entitled case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 12th day of February, 2008, at San Diego, California.

Respectfully submitted,

By:_________/S/____________________
FREDERICK SCHENK, CA Bar No. 086392
Attorneys for Plaintiff
CASEY, GERRY, SCHENK,
FRANCAVILLA, BLATT & PENFIELD LLP
110 Laurel St
San Diego, CA 92101
619-238-1811
619-544-9232 (Fax)

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--oOo--

LEO HICKMAN SWEENEY,

Plaintiff,

vs. No. C05-1637Z

SABERHAGEN HOLDINGS,
INC., et al.,

Defendants.
______________________________/

DEPOSITION OF

BEN LEHMAN

-----------------------------------

Friday, December 23, 2005

REPORTED BY: DIANE K. LUSICH, Nevada CSR NO. 181
Calif. CSR NO. 5218

Job No. L05-198

A P P E A R A N C E S

On Behalf of the Plaintiff:
BERGMAN & FROCKT
705 2nd Avenue
Suite 1601
Seattle, Washington 98104
206.957.9510
BY: J. CONARD METCALF, Attorney at Law

On Behalf of Defendant Elliott Company:

FORSBERG UMLAUF
900 Fourth Avenue
Suite 1700
Seattle, Washington 98164
206.689.8500

BY: MELISSA K. HABECK, Attorney at Law

On Behalf of Defendant GM:

GAITAN GROUP
3131 Elliot Avenue
Suite 700
Seattle, Washington 98121
206.346.6000

JASON HAAS, Attorney at Law

On Behalf of Defendant J.T. Thorpe & Son
STAFFORD, FREY, COOPER
3100 Two Union Square
601 Union Street
Seattle, Washington 98101
206.667.8277
BY: TAPITHA MILLER, Attorney at Law

I am not sure of any specific date.

BY MR. METCALF:

Q. Do you remember the source of any such document that you read?

MS. HABECK: Same objection.

THE WITNESS: You mean the source that said it to me or the original source?

BY MR. METCALF:

Q. The source that provided it to you, sir, I'm sorry.

A. The source that provided it to me was a legal firm.

Q. Do you remember which legal firm?

A. Probably it was the Tarwarner firm in Knoxville, Tennessee. But it might have been the firm which employs Mr. Turnicut Shandy in Chicago.

Q. Do you know Carl Mangold?

A. How do you spell the name?

Q. The first name is C-a-r-l and the last name is M-a-n-g-o-l-d.

A. No.

Q. Now, to your knowledge, sir, are there any military, federal government, specifications that expressly prohibit the putting of a label on equipment to be used aboard ship which contains language about

asbestos being potentially harmful to the health and precautionary measures to be taken to eliminate or minimize the risk of exposure to asbestos?

MS. HABECK: Objection to form, overbroad, vague as to time.

Go ahead.

THE WITNESS: The question is, do I know of any specific prohibition about doing something?

BY MR. METCALF:

Q. Correct.

A. No. There are many things that could be prohibited, certainly, that could be prohibited, but it's not and never has been.

Q. Now, do you know of any specific instance when a manufacturer of equipment to be used aboard a Navy vessel went to the Navy and asked for permission to put an asbestos warning label on a piece of equipment and the Navy refused that permission?

MS. HABECK: Objection to the form, vague, overbroad.

Go ahead.

THE WITNESS: I cannot think of any such instance being recorded in any document that I have ever read.

BY MR. METCALF:

Q. Do you know the name of anybody in the United States Navy who refused an equipment manufacturer's request to place a warning label concerning asbestos on equipment that was to be installed in a Navy ship?

MS. HABECK: Objection to the form, overbroad, vague.

THE WITNESS: No, I do not know that. I have never, never had occasion to query Naval officers who were on active duty during the periods I think are in question, whether anybody had ever made such request.

MR. METCALF. I'd ask the reporter to hand the witness Exhibit 1, which is the Nesbiet deposition that you gave; and Exhibit 2, which is the Westmiller deposition which we have already referenced.

BY MR. METCALF:

Q. Sir, do you have the deposition you gave in the Westmiller case there in front of you, Exhibit 2?

A. First I have Nesbiet.

Yes, now I have Westmiller.

Q. Okay. And what I would like to do, frankly, sir, is to incorporate the questions and the answers from the Westmiller deposition into this deposition, so I don't have to go over the same stuff. And to do that what I need to do is ask you if there are any answers that you know of that you gave in that deposition that

CERTIFICATE OF WITNESS

I have read the foregoing deposition and declare under penalty of perjury that the foregoing testimony is true and correct.

Executed at _______________,

California, this _____________ day of _______________,

20____.

______________________

Ben Lehman

Subscribed and sworn to before me

this ______ day of _______________, 20____.

______________________________

Notary Public

____ The deponent failed to appear or to send notice in order to approve or sign his deposition.

____ The deponent refused to approve or sign his deposition for the following reasons:

____ The deponent approved his deposition by means of the document attached.

____ The deponent waived reading, correcting, and signing ___ on the record or ___ by means of the

I, DIANE K. LUSICH, hereby certify that the witness in the foregoing deposition was, by me, duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition testimony of the witness was taken down in shorthand by me, a certified shorthand reporter and a disinterested person, at the time and place therein stated, and that the testimony of said witness, including certified copies, constitutes a full, true and correct transcription of my shorthand notes, and was thereafter reduced to typewriting by computer under my direction and supervision, to the best of my ability.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

Dated this 17th day of January, 2006.

Certified Shorthand Reporter
License No. 5218
State of California

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 01-10578 |
| | ) | |
| FEDERAL-MOGUL GLOBAL, INC. | ) | Chapter 11 |
| | ) | (Pending in the United |
| DEBTOR, | ) | States Bankruptcy Court |
| vs. | ) | For the District of |
| | ) | Delaware) |
| DIANE MATHIAS, Individually | ) | |
| and as Personal Representative | ) | |
| of the Heirs and Estate of | ) | EP 01 CA 0380 DB |
| GEORGE MATHIAS, Deceased | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ACandS, INC., et al. | ) | |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
PARIS DIVISION

| | | |
|---|---|---|
| COLLEEN CARTER, individually | ) | |
| and as Personal Representative | ) | |
| of the Heirs and Estate of | ) | |
| MARVIN CARTER, Deceased; and | ) | 3:02CV00009 |
| SUZETTE OLSON, Individually | ) | |
| and as Personal Representative | ) | |
| of the Heirs and Estate of | ) | |
| ORVILLE OLSON, Deceased, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ACandS, INC., et al. | ) | |

0002

(Caption Page Cont.)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

LAURA MADDEN, Individually and )
as Personal Representative of )
the Heirs and Estate of THOMAS ) 3:02CV00194
MADDEN, JR., Deceased, )
Plaintiff )
vs. )
)
Able Supply Company, et al, )
Defendants. )

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JON STEWART and SANDRA STEWART ) Case No. 02-CV-1104
)
v. )
)
ACandS, Inc., et al )

DEPOSITION UPON ORAL EXAMINATION
FOR THE PURPOSES OF DISCOVERY
OF: RADM ROGER B. HORNE USN (RET)
JUNE 19, 2002 - 10:30 A.M.
SEATTLE, WASHINGTON

Reported by: Gwen C. Alexander, CCR
CCR No. ALEXAGC406J6

APPEARANCES

FOR THE PLAINTIFF(S):

Charles S. Siegel, Attorney
Waters & Kraus, LLP
3219 McKinney, Suite 3000
Dallas, Texas 75204

FOR THE DEFENDANT, VIACOM, INC.:

William D. Harvard, Attorney
Evert & Weathersby, LLC
P.O. Box 1787
Athens, Georgia 30603

FOR THE DEFENDANT, IMO INDUSTRIES:

J. Michael Jordan, Attorney
Gardere Wynne Sewell, LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007

FOR THE DEFENDANT, GARLOCK GASKETS:

Jay Carlson, Attorney
Preston Gates Ellis, LLP
701 Fifth Avenue, Suite 5000
Seattle, Washington 98104-7078

0004

APPEARANCES (CONT.)

FOR THE DEFENDANT, GENERAL ELECTRIC:
John A. Heller, Attorney
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603

FOR THE DEFENDANT, CONGOLEUM CORPORATION:
Michelle A. Corsi, Attorney
Lee Smart Cook Martin & Patterson, PS, Inc.
1800 One Convention Place
701 Pike Street
Seattle, Washington 98101-2585

FOR THE DEFENDANT, BROWN & ROUT:
Michael John Ramirez, Attorney
Godwin Gruber
Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270

0005

APPEARANCES (CONT.)

FOR THE DEFENDANT, RILEY STOKER CORPORATION:
Bernard Zwillenberg, Attorney (via telephone)
DeHay & Elliston
901 Main Street
Dallas, Texas 75202

FOR THE DEFENDANT, FOSTER WHEELER:
Lewis Miltenberger, Attorney (via telephone)
Cordray Goodrich & Miltenberger
108 West 8th Street, Suite 500
Fort Worth, Texas 76102

FOR THE DEFENDANT, COMBUSTION ENGINEERING:
Thomas Scott, Attorney (via telephone)
Spain & Hastings
3900 Two Houston Center
909 Fannin
Houston, Texas 77010-1010

0006

## EXAMINATION INDEX


| EXAMINATION | PAGE NO. |
|---|---|
| By Mr. Siegel | 8, 88, 113 |
| By Mr. Jordan | 62, 109 |
| By Mr. Heller | 72, 107 |
| By Mr. Harvard | 74, 109 |
| By Mr. Miltenberger | 103 |


## EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 (Plf.) | Affidavit of Roger B. Horne, Jr., in Support of Defendant Westinghouse's Notice of Removal of Civil Action, and Exhibits 1-6 | 10 |
| 2 (Plf.) | Military Specification for Technical Manual, MIL-M-15071H | 45 |
| 3 (Dft.) | Resume of Roger B. Horne | 73 |
| 4 (Dft.) | Bureau of Ships Manual, Chapter 39, NAVSHIPS 250-000(39) | 79 |

BE IT REMEMBERED that the deposition upon oral examination of ROGER B. HORNE, was taken on JUNE 19, 2002, at the hour of 10:30 A.M., at SEATTLE, WASHINGTON, before Gwen C. Alexander, CCR, Notary Public in and for the State of Washington, residing at Seattle, Washington;

Whereupon, the following proceedings were had, to-wit:

* * * * *

MR. SIEGEL: We're here for the deposition of Roger Horne. It has been noticed by the plaintiffs in three cases removed to federal court by Westinghouse and a fourth case removed to federal court by Foster Wheeler. Or, frankly, I'm not sure it's been noticed in the Foster Wheeler removed case, but it's being taken by agreement in that case. And that is the Stewart case, recently removed to federal court.

The plaintiffs are taking the deposition in connection with and subject to their motion for remand. It is discovery related to issues involved in the removal and remand and the deposition is not a waiver of plaintiff's position about proceeding in federal court or their objection to federal court. It, rather, is being taken in connection with their motion for remand.

If no one else has any statement for the record, I'll begin.

0031

insulation?

A. I believe turbines -- everybody understands that.

Q. Right. And that's because people can't get near the turbines to do anything unless they're insulated; is that right?

A. It would be uncomfortable to touch them.

Q. Right. In fact, the turbines themselves can work without insulation. They just can't work with humans near them, right?

A. That's correct.

Q. Okay. And, again, nothing in this specification, either in 3.2.13 or anywhere else in the specification requires the use of asbestos; is that correct?

A. That's correct.

Q. Is there anything in this specification, anywhere in it, that has anything to do with putting a warning on thermal insulation about it being hazardous?

A. No.

Q. Is there any other specification that you know of that relates to that subject?

A. To warning labels?

Q. Um-hmm.

A. If there's anything in a specification, I

0032

don't think there's a specification I'm familiar with that specifically concerns warning labels.

Q. Right.

A. The warning labels may be -- or labels in general may be a subtopic of some specification.

Q. But you're not aware of any Navy specification that ever at any time prohibited a manufacturer from putting a warning label about asbestos on insulation, are you?

A. There's -- there would be -- I don't believe there would be a specification that would be written like that.

Q. There's just no specification that related to that question at all?

A. Not to my knowledge.

Q. Okay.

A. I don't think there would be a need to.

Q. Why do you not think that?

A. Because the -- are we talking now specifically about asbestos?

Q. Um-hmm.

A. The Navy has their own knowledge of insulation and the general shipbuilder has their general knowledge. And I don't think a company like -- another company vendor would be putting that kind of -- wanting

0033

to put that kind of a label on their product.

Q. But there's no Navy specification that forbids it, is there?

A. I can't say there is a specification that forbids it, but there is -- there are probably inferences that the Navy does not want to have general warning labels about things that they have procedures and training associated with.

Q. Where do we see that inference? Where does that inference exist in any regulation or specification?

A. I think there is -- in one of the -- one of the specifications that concerns the -- it may be on a list or what have you, that says they don't want to have general labels placed on equipment for things which might create apathy. It's like putting a label on the trigger of a gun or something.

Q. But as a rear admiral who spent his career in the Navy, you cannot point to a single specification anywhere that says, "Contractor, don't put a warning about asbestos hazards on insulation"?

A. Other than what I just mentioned to you.

Q. And that has nothing to do with asbestos or any other specific hazard. It's just a general --

A. General, right. The Navy doesn't want to

have general -- if it's a very subtle hazard like an electrical shock hazard or something of that nature, they might. But they would not want to have labels on all the steam lines throughout the --

Q. For obvious hazards like "Don't jump off the side of the ship" or something like that, they don't want warnings cluttering up the ship?

A. They're the type of things that people are trained to avoid as opposed to having something in front of them.

Q. Now, are you aware of any other directive or specification or regulation or order of any kind that the Navy ever sent to a contractor forbidding them from putting a warning on about the hazards of asbestos insulation?

A. No, other than what I just mentioned to you a moment ago.

Q. And, again, that is not specific to asbestos or to any other particular problem?

A. That's correct. It's general -- would not be the case. The Navy would not want to have warning labels for insulation containing asbestos.

Q. And that is simply your opinion? That's not based on any Navy document that exists, is it?

A. It's based on my opinion on the fact that

once we tried to remove insulation from the ships, once we understood the significance of asbestos, we were faced with the fact that it wasn't -- didn't make sense to try to go in and remove it. We were creating a worse problem.

And so we developed other methods of controlling it. At that point we did not go throughout the ship and put label plates on everything that says this contains asbestos, that contains asbestos. If we were concerned, if labels were the answer, we would have put them on then because certainly at that point we understood the situation. But we developed other means of making people aware of the significance of asbestos.

Q. And is that a decision that you made? Or who made that?

A. No. It's a decision that was made by the Navy.

Q. But, again, at the time that my clients served on these ships in the '50s, let's say, regardless of what the Navy knew or didn't know, there is no regulation that you can point to that forbids Westinghouse or any other contractor from warning of the hazards of asbestos, is there?

A. There's nothing that forbids somebody from warning somebody of something. But it doesn't -- the

0036

Navy would not want it in the form of label plates. If Westinghouse wanted to write a letter to the Navy and say, "You may elect to put insulation on our turbines that contain asbestos, but we think asbestos is harmful," the Navy would take that under consideration along with all the other information the Navy had concerning insulation and what have you.

Q. Sure.

A. But as far as the decision to put label plates on it, I'm quite certain the decision as it was made later on would be not to put label plates on.

Q. Well, my --

A. The contractor couldn't put label plates on.

Q. The contractor could not go aboard ship and put a label plate on without Navy permission?

A. They couldn't put a label plate on it at any point without Navy permission.

Q. Right. But there was nothing in the Navy regulations that affirmatively forbade such a warning, was there?

A. I don't think I understand. Is there a line item in some regulation that says, "Westinghouse, you can't put a label on" --

Q. Right.

0037

A. No, there's no line item like that. It would be foolish. But the Navy would not entertain having a label plate on it and, I'm sure, on their equipment to that regard.

Q. Did the Navy ever tell Westinghouse that, to your knowledge, or any contractor?

A. Not to my knowledge, other than the fact that they put in at least one of the instructions or specifications that they weren't interested in those kind of label plates.

Q. Well, when you say, "they weren't interested in those kind of label plates," how did that regulation define "those kind of label plates"?

A. Just about the way I said it.

Q. Well, it didn't say asbestos, did it?

A. Well, it said apathy, things that might create general concern or something, not something that was associated with the operation of their equipment, that it was subtle.

Q. And in your view, that had to do with hazards that tend to be thought of as open and obvious hazards?

A. I think they were hazards that were general in nature. Certainly, insulation on a ship is a general thing. It's not peculiar to turbines or steam

0038

lines. There's all kinds of different uses of insulation.

Q. And, again, I just want to make sure I know what your answer is. If Westinghouse simply had wanted to put a warning on its turbines that said to wear a mask when you're ripping up this asbestos or around this asbestos, whether or not Westinghouse actually wanted to do that and whether or not the Navy might have wanted to do it, there's nothing in the Navy regulations that forbade it, is there?

A. Doesn't make sense because Westinghouse didn't put any insulation on the turbines.

Q. We can leave that aside too.

A. I can't point to a regulation that says, no, you shall not do it. However, the Navy would not allow it. I mean you're asking me to -- to say, is there something in a regulation that says don't put a label plate on this because of asbestos, I can't point to a line item.

But on the other hand, if it were to happen, the Navy would take it off. It's not what the Navy wanted to have happen. It's not desired by the Navy.

Q. When did you first serve in the Navy?

A. 1956. Well, actually 19 -- the Naval

0039

Academy in 1952.

Q. And what was your job then in the Navy?

A. After I graduated from the Naval Academy?

Q. Yeah.

A. I was on a destroyer.

Q. You were not personally involved in the Navy's occupational health and safety decisions, were you?

A. No, not in their decisions. I had people working for me at various points in my career who were.

Q. Did you personally ever make any decisions about asbestos use aboard ship in the Navy?

A. Not the use. I had -- I worked on trying to remove it.

Q. So when Mr. Mathias was serving in the Navy in the early '50s, I think it was, you had just joined the Navy, right?

A. Early '50s, I had just joined the Navy.

Q. Right. And you don't have any personal knowledge about anybody at that time deciding that they would not have entertained the warning about asbestos, do you?

A. No.

Q. You don't know who the people in charge of that decision were at that time, do you?

A. No.

Q. The thrust of your affidavit is that there are a number of specifications and regulations that govern the construction and provision of machinery like turbines; is that correct?

A. That's correct.

Q. And those specifications are written initially by the Navy?

A. The -- the way the specifications are developed, if it's a new area, say the Navy needs to have -- well, take the case of insulation. The Navy will say we have a need to keep the ambient temperature down within these spaces so much. The temperature is going to be -- surface temperature of the piping is going to be so much and what have you.

The Navy then will, either through its labs such as the Navy Experiment Station or what have you, will start trying to find what the solution is.

They may go to technical societies like ASTM. They may go to the Society of Mechanical Engineers in this case. They may go to vendors. And with a set of performance requirements, they will determine how to solve the problem with the best technical assistance they can get from societies, technical societies, and their own laboratories and

vendors.

Once they find that, once they find -- somebody comes in and says, "I can solve this problem," then the Navy will test those things in their own laboratories. And if it meets the requirements, there's no problems with them, then the specification will be formed and -- and a vendor's products will go on a qualified products list.

And any other people who want to provide that will have to go through the same testing to see if their product meets the specifications that were drawn in.

Q. Isn't it a fact that vendors frequently had involvement in writing the specifications?

A. Not in writing the specifications, but in -- they were consulted at times and asked with regard to what the capabilities, what the status of the state of the art was.

Q. Is it also a fact that specifications were frequently written precisely to acknowledge those capabilities, right?

A. They would certainly take them into consideration if it solved the problem that the Navy had.

Q. Now, when a contractor feels like a

deviation from the specification is in order, the contractor can suggest such deviation to the Navy, correct?

A. Yes. They can suggest a deviation. The Navy can take it under consideration.

Q. And the Navy is free to accept it or reject it?

A. That's -- that's correct.

Q. And the Navy does have the final authority about that?

A. That's correct.

Q. But certainly the contractor is free to make any such suggestions, right?

A. You're talking about the producer of a product?

Q. Yes.

A. Such as an asbestos producer?

Q. Such as a Westinghouse-manufactured turbine.

A. If Westinghouse were to come in regarding some feature of the turbine, mechanical feature of the turbine, that the specifications seem to conflict with their best practice, they could come back and recommend maybe the use of a certain type of fastener or what have you. And the Navy would take that under consideration

and may waive that particular part of the thing for that particular application.

Q. And if Westinghouse has a concern about the safety of the operation of the turbine or the maintenance of the turbine or the repair of the turbine or any concern like that, it is free to suggest that to the Navy, which then either accepts it or rejects it?

A. If they have a concern -- you mean regarding a specification requirement?

Q. Regarding anything related to the use of the turbine.

A. Well, the Navy has -- requires a contractor to have instructions, produce instruction manual, which if there's some -- some possibility of a -- something the Navy -- that's not in the general training area or what's expected the Navy knows how to operate a turbine, but if there's something that has to do with an overspeed trip or something of that nature that requires special warning, then, in the instruction manual that's specific to that equipment, the instruction manual would be the place for them to place that. And the Navy would review that and okay it if they wanted that in there.

Q. The specification for technical manuals is MilSpec 15071; is that correct?

A. I couldn't tell you the number of it.

Q. But are you familiar with that?

A. I have at various times looked at it, I'm sure.

Q. Doesn't it in fact require the contractor to put warnings of serious hazards that could lead to personal injury or death?

MR. HARVARD: Object to the form.

THE DEPONENT: I don't remember the specific wordings in there. But what we wanted in the technical manual were items that were different about that equipment. I mentioned the case of an overspeed trip.

You don't want a turbine to -- if there's something peculiar about the manner in which a turbine will -- say you lose lube oil pressure or control oil pressure and as a result of that, lose control of the throttles and a turbine doesn't automatically trip off, then what should you do in that kind of situation, those kind of things are things concerning specific items concerning the operation of that equipment or what is wanted in the tech manual.

MR. SIEGEL: Do you have a copy of 15071? I don't have my copy from yesterday.

MR. HARVARD: That's fine. I do have a

copy of the H version from July of '78, which I think is the one you were looking at. Why?

MR. SIEGEL: Can we mark it?

MR. HARVARD: I'm just teasing, Charles. You can mark that. But I'll tell you, this is my only copy that I've got here. I think it is kind of marked up. If you give me a second, I'll look and see if I've got a --

MR. SIEGEL: Here's another one.

MR. JORDAN: Could you give me that number again, the spec number.

MR. HARVARD: MIL-M-15071. And the H version is July of '78.

MR. SIEGEL: Mark this as Plaintiff's Exhibit 2.

(Plaintiff's Exhibit No. 2 marked for identification.)

BY MR. SIEGEL:

Q. I'll let the record reflect you're looking at a copy of Plaintiff'S Exhibit 2 with Mr. Harvard. And will you just identify Plaintiff's Exhibit 2 for the record.

A. This is 15071.

Q. Military specification?

A. Military Specification for manual,

technical manual.

Q. Now, is this in fact the specification that you were referring to just a few minutes ago?

A. Yes. This is -- this is a specification for manuals, yes.

Q. I need to find one portion of it real quickly.

A. Page 4.

Q. That's it. On Page 4 we have paragraph 3.3.3.1, entitled Warnings and Cautions; is that correct?

A. That's correct.

Q. And this paragraph leads off with a statement that "Warning and caution statements shall be included for emphasis in all applicable installation, operating, maintenance, and repair procedures and data in according with MIL-M-38784 and as follows:" And then it proceeds to list a number of further specifications about these warning and caution statements; is that right?

A. That's correct.

Q. And have I read this correctly so far?

A. Yes.

Q. In the third line of 3.3.3.1 it refers to another specification, MIL-M-38784. Are you familiar

with that one?

A. Not right offhand, no.

Q. Now, the first requirement for warning and caution statements is listed as little (a) and it says, "A warning statement shall be used to call particular attention to a step of a procedure which, if not strictly followed, could result in serious injury or death of personnel." Is that correct?

A. That's correct.

Q. All right. And when they say "to a step of a procedure," they are referring to the language above which describes those procedures as all applicable installation, operating, maintenance and repair procedures; is that correct?

MR. HARVARD: Object to the form, assumes facts not in evidence.

BY MR. SIEGEL:

Q. I'm simply asking you if that's how you read that.

A. Yes. But I'm looking at this with a sense that the procedure -- mostly what they're really referring to is the operating procedure of the equipment.

Q. Okay. But it does say --

A. And perhaps the maintenance, yes.

Q. It refers not only to operating procedures, but installation, maintenance, and repair, correct?

A. Yes. I guess you could say that.

Q. And so if there were any step in the installation, operating, maintenance and repair of a turbine aboard a ship, the company that supplied that turbine to the Navy must put a warning and caution statement in the technical manual if any of those steps could lead to serious injury or death; is that correct?

A. No.

MR. HARVARD: Object to the form.

BY MR. SIEGEL:

Q. Why is that not correct?

A. Well, if you go down to paragraph (d) --

Q. Okay.

A. -- it says, "The use of warning or caution statements shall be limited to significant cases so that too extensive use of these statements will not make technicians and operators apathetic of them and thus reduce their value."

Q. All right. And you would agree that any procedure that has a chance of resulting in serious injury or death is a significant case, correct?

MR. HARVARD: Object to the form, vague

use.

BY MR. SIEGEL:

Q. Other than open and obvious hazards such as jumping off the ship?

MR. HARVARD: I still object to the use of the form, "any chance."

THE DEPONENT: If we're trying to imply that the use of insulation falls under that category by my answering that question, the answer would be no because insulation is used throughout the plant and not just on the turbines. And so it falls under the category (d), which is "The use of warning and caution statements shall be limited to significant cases so that too extensive use of these statements will not make technicians and operators apathetic of them and thus reduce their value."

The Navy would be stuck with a situation of having to put labels throughout the ship if they were going to put it on the turbine, which, frankly, that wouldn't make any sense. And they come to that conclusion later on when we found out that asbestos really was significant.

Q. Yeah. In fact, asbestos isn't used aboard ship anymore extensively, is it?

A. Not -- no.

Q. And why is that?

MR. HARVARD: I'm sorry. Finish your answer, please.

THE DEPONENT: Before the Navy -- when we found out, we started removing asbestos from the ships because we determined it was a health hazard and we needed to take special action. We started -- we started with the premise that we're going to remove all the asbestos from the ships. We found out that that really was not -- on existing ships -- we found out that that was not -- was going to do more harm than good.

We couldn't stop the ships from operating, operating under different wars and different scenarios that were significant to this country. So what we did was we -- we'd come across work that required the removal of asbestos, we put specific controls on it. We told everybody about it. We trained them. We trained the sailors.

And in areas where we did work that required removal of asbestos that wasn't captivated, we removed it under those conditions. And then when we replaced it, we painted it a different color underneath the white paint, and we trained everybody and said don't remove any -- don't remove any insulation unless you know what it is.

And once we determined what it is, then we'll go about the repair work and the procedures that are appropriate. And the areas that were not asbestos were clearly indicated in a sublayer of paint which we could have. We didn't put labels on it. We trained the people and we put special controls over the removal of it.

BY MR. SIEGEL:

Q. And the Navy did all these things because they know asbestos is deadly, correct?

MR. HARVARD: Object to the form; argumentative.

THE DEPONENT: We knew that certain exposures at certain levels might result in asbestosis.

BY MR. SIEGEL:

Q. And cancer?

A. Yes.

Q. In fact, the Navy has no doubt about that fact, correct?

MR. HARVARD: Object to the form; calls for speculation.

THE DEPONENT: I'm not a medical expert, but from what I know, we put special controls on it because we were concerned.

BY MR. SIEGEL:

Q. Right. And this was a massive, very expensive operation to make these steps occur, correct?

A. That's correct.

Q. And that would have only been done in the event of a hazard of the seriousness of asbestos, correct?

A. The Navy must have considered it that way. We did it, but I don't know what the -- I don't know the degree of the hazard from a health standpoint.

Q. And back to 3.3.3.1, it requires these kinds of warning statements in which procedures could result in serious injury or death of personnel; isn't that correct?

A. We're not talking about labels here?

Q. We're talking about warning statements in the technical manual.

A. If there was a technical manual which was to be written concerning the installation of insulation that contained asbestos, after the Navy had knowledge of it, I would expect that particular technical manual to issue that kind of a warning.

Q. You don't know when the Navy learned about the hazards of asbestos, do you?

A. No.

Q. And you have no idea at all about what the

0117

CERTIFICATE

STATE OF WASHINGTON )
)
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed and foregoing deposition of each witness named herein was taken stenographically before me and reduced to typewriting under my direction.

I further certify that each said witness examined, read and signed his/her deposition after the same was transcribed unless indicated in the record that the parties and each witness waived the signing.

I further certify that all objections made at the time of said examination to my qualifications or the manner of taking each deposition, or to the conduct of any party have been noted by me upon each deposition.

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof.

I further certify that each witness, before examination, was by me duly sworn to testify the truth, the whole truth and nothing but the truth.

I further certify that the deposition as

transcribed is a full, true and correct transcript of the testimony, including questions and answers, and all objections, motions and exceptions of counsel made and taken at the time of the foregoing examination.

I further certify that I am sealing the deposition in an envelope with the title of the above-referenced cause thereon and marked "Deposition" with the name of each witness and promptly delivering the same to the offices of THE BOARD OF INDUSTRIAL INSURANCE APPEALS.

IN WITNESS WHEREOF, I have hereunto set my hand and affirmed my Official Seal this 24th day of June 2002.

________________________________

Notary Public in and for the
State of Washington,
Residing at Seattle, Washington.
(Notary expires 02-09-04)
(CCR No. ALEXAGC406J6)

# EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEWIS A. SEYMOUR, Plaintiff,

vs. — No. C05-2145JCC

SABERHAGEN HOLDINGS, INC., ET AL., Defendants.

* * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PRISCILLA ALIX, as Personal Representative of the Estate of ALFREDO GREGORIO, SEYMOUR, Plaintiffs,

vs. — No. C05-2144JLR

SABERHAGEN HOLDINGS, INC., ET AL., Defendants.

VIDEOTAPED DEPOSITION OF THOMAS KEENAN
VIA VIDEOCONFERENCE,

A witness herein, taken in accordance with Pennsylvania Rules of Civil Procedure No. 4007.1, by and before Dutcheen O. Cameron, Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of ACBA Services, Inc., 129 North Pennsylvania Avenue, Greensburg, Pennsylvania, on Wednesday, January 25, 2006, at 2:13 p.m.

APPEARANCES

Counsel for the Plaintiffs:
Conard Metcalf
BERGMAN & FROCKT
705 Second Avenue, Suite 1601
Seattle, WA 98104

Counsel for Elliott Company:
Carl E. Forsberg
FORSBERG & UMLAUF, P.S.
900 Fourth Avenue, Suite 1700
Seattle, WA 98164

Counsel for Saberhagen Holdings, Inc.:
Emily Studebaker
CARNEY BADLEY & SPELLMAN
701 Fifth Avenue, Suite 5800
Seattle, WA 98104

Counsel for Ingersoll-Rand; and Leslie Controls, Inc.:
Andrew May
CORR CRONIN MICHELSON BAUMGARDNER
& PREECE, LLP
1001 Fourth Avenue, Suite 3900
Seattle, WA 98154

Counsel for Carrier Corportation:
Michael Jaeger
WILSON SMITH COCHRAN DICKERSON
1215 Fourth Avenue, Suite 1700
Seattle, WA 98161

Counsel for Crane Co.:
Brett Anderson
LANE POWELL, PC
1420 Fifth Avenue, suite 4100
Seattle, WA 98101

Counsel for Viad Corporation:
Jeff Kestle
GARDNER BOND TRABOLSI ST. LOUIS
& CLEMENT, PLLC
2200 Sixth Avenue, Suite 600
Seattle, WA 98121

Counsel for J.T. Thorpe & Son, Inc.:
Krista Mirhoseini
STAFFORD FREY COOPER
601 Union Street, Suite 3100
Seattle, WA 98101

30d8ecb6-78e2-4122-a90e-9f33016eb3a4

your curriculum vitae?
A. Yes.
Q. When you refer to rotating machinery being one of the things in your area of responsibility, could you give us examples of the kinds of equipment that are rotating machinery?
A. From a standpoint of my career?
Q. Correct.
A. Compressors and turbines.
Q. And you were involved in the -- as an employee of Elliott in the manufacture of compressors and turbines?
A. Yes.
Q. And you were involved in the sales of compressors and turbines?
A. What do you mean by the word sales?
Q. Did you ever have direct or supervisory responsibility as an Elliott employee for sales of Elliott equipment?
A. The term sales is what's throwing me. Are you talking about marketing and sales as opposed to --
Q. Correct.
A. Okay. No.
Q. Are you aware, Mr. Keenan, of the existence of any navy or government specification that

would have -- that specifically said that Elliott would not be permitted to put warnings or cautions on equipment that Elliott was manufacturing and selling to the navy and I'm talking about warnings or cautions concerning asbestos?

A. Did you say specifications?

Q. Any specification, any -- yeah, specifications.

A. No.

Q. Are you aware of any rule or regulation that specifically said that Elliott would be forbidden from putting an asbestos caution or warning on equipment that Elliott manufactured and sold to the navy?

A. Not a specification or a regulation.

Q. Are you aware of anything in writing that's forbade Elliott from putting an asbestos caution or warning on equipment that it was manufacturing and selling to the navy?

A. No.

Q. Are you aware of whether Elliott ever approached the navy or any navy representative and asked permission to put an asbestos caution or warning on any equipment manufactured by Elliott and sold to the navy?

A. I'm not aware of any.
Q. Did Elliott at any time -- focussing now on Elliott to your knowledge on Elliott equipment that was sold to entities other than the navy, non-navy Elliott equipment on which a caution or warning was placed concerning asbestos?
MR. FORSBERG: Object to the form.
A. No.
BY MR. METCALF:
Q. Did Elliott ever request permission from any non-navy customer to your knowledge to put an asbestos caution or warning on Elliott equipment being manufactured by Elliott and sold to a non-navy customer?
A. Not to my knowledge.
MR. FORSBERG: Object to the form.
BY MR. METCALF:
Q. Did you have any -- up until about three months ago when you got your table and chair there at the Elliott building, between the time you retired I think in 2004 you said and up until about three months ago, did you have any consulting relationship with Elliott?
A. Yes.
Q. And what was the nature of the consulting

system set up to have, make standard name plates, blank name plates, yes.

Q. Where is that -- where are those files or records located that would relate to name plate drawings?

A. That would be located in our P sheet department where -- the P sheet is basically a small part for discussion's sake.

Q. Are you saying P-I-E-C-E sheet?

A. No, P like in Paul, sheet, yes.

Q. Okay. P, letter P?

A. Part sheet. I guess -- I assume that that's what it means. Part sheet.

Q. But the nomenclature at Elliott is letter P sheet?

A. Yes, for small parts.

Q. And would these P sheet records include to your knowledge drawings for name plates for both commercial and naval equipment?

A. Yes.

Q. Some of the equipment that Elliott made and sold to the navy contained -- had asbestos containing materials in them; is that correct?

MR. FORSBERG: Object to the form.

A. As specified by the navy, yes.

BY MR. METCALF:

Q. And the asbestos containing materials would be gaskets and packing primarily?

A. That's correct.

Q. Where would Elliott purchase to your knowledge the asbestos gaskets and packing that were used in the equipment it made for the navy?

A. A variety of suppliers. Don't know them right offhand.

Q. The equipment that Elliott made for commercial applications, would also some of that contain asbestos gaskets and packing?

MR. FORSBERG: Object to the form.

A. Yes.

BY MR. METCALF:

Q. Where would Elliott buy the asbestos gaskets and packing that were used in its commercial equipment, the equipment made for commercial applications, how's that?

A. Variety of suppliers.

Q. Would the suppliers of the asbestos gasket and packing be any different for the navy, equipment made for the navy compared to the equipment made for commercial applications?

A. The navy had very specific requirements

CERTIFICATE

COMMONWEALTH OF PENNSYLVANIA )
) SS.
COUNTY OF WESTMORELAND )

I, Dutcheen O. Cameron, a Notary Public within and for the Commonwealth of Pennsylvania, do hereby certify that the witness, THOMAS KEENAN, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth, and that the foregoing deposition was recorded in stenotype by me and reduced to typewriting under my direction.

I further certify that the said deposition constitutes a true record of the testimony given by said witness; that the foregoing deposition was taken at the time and place stated herein.

I further certify that I am not a relative, employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 15th day of February, 2006.

COMMONWEALTH OF PENNSYLVANIA )
) ERRATA SHEET
COUNTY OF WESTMORELAND )

I hereby make the following changes in my deposition testimony:

PAGE NO. LINE NO. REASON FOR CHANGE:

CERTIFICATE OF READING

I, THOMAS KEENAN, hereby acknowledge that I have read the foregoing transcript of my testimony on this day of ________, 2006, taken by Dutcheen O. Cameron, Court Reporter. I further certify that the answers are true and correct as transcribed unless otherwise as noted on the Errata Sheet.

THOMAS KEENAN

Subscribed and sworn to before me this _____ of _____________, 2006.

Notary Public

# EXHIBIT D

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 04-01018-L

| | |
|---|---|
| BETTY P. RIGGLE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE HEIRS AND ESTATE OF RICHARD RIGGLE, DECEASED, AND RICHARD MARC RICHARD | IN THE DISTRICT COURT |
| vs. | DALLAS COUNTY, TEXAS |
| ALLIS-CHALMERS CORPORATION, AGCO CORPORATION, (SUED INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO ALLIS-CHALMERS CORPORATION), ET AL | 68TH JUDICIAL DISTRICT |

**TRIAL ON THE MERITS**

On the 8th day of December, 2006, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Charles Stokes, Judge Presiding, held in Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

ORIGINAL

**P R O C E E D I N G S**

*(Jury present)*

*THE COURT:* Ladies and gentlemen of the jury, we're going to call a witness out of order, one of the defense witnesses because of scheduling issues. We do that all the time in trial. So it will be a -- a defense witness will be the next person and we'll go back to the plaintiffs' case after this one witness.

*MR. KARREN:* Yes, sir.

*THE COURT:* Okay. All right. So whenever you're ready to call your witness.

*MR. SHEFT:* The witness is Dr. Charles Cushing, your Honor.

*THE COURT:* Let me swear you in.

*(Witness sworn)*

*(Pausing)*

*THE COURT:* Okay. Have a seat.

*MR. SHEFT:* Shall I proceed, your Honor?

*THE COURT:* Sure.

**CHARLES CUSHING,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

*BY MR. SHEFT*

Q. Dr. Cushing, what is your occupation?

A. Yes. Good morning. I'm a naval architect and

been placed by a seaman or some worker on the ship?

A. Well, that's not exactly what I said. What I -- and what I said was that the ships force could have placed these instructions on there and have been on many naval vessels and what you find often on a piece of equipment are typed up instructions that the engineering officer feels is important or the chief -- the Navy chiefs feel are important and that procedures should be followed. So they're placed right on various pieces of equipment.

Q. Well, it could have been --

A. That's very well what that could be.

Q. Could be, but you don't know, do you, sir?

A. It looks different from anything I've seen on any other naval ship.

Q. Okay.

A. It's yellow and I've never seen a set of instructions looking like that on another naval ship.

Q. Okay. Now, it could have been put on there by the manufacturer, could it?

A. Could have been put on by anybody.

Q. Yes. So the Navy wouldn't have kept the manufacturer from putting a sign on there, would they?

A. I think they would have controlled what was put on there.

Q. In fact, the Navy required hazardous things to be labeled by the manufacturer, did they not, hazardous chemicals?

A. I think they required what warnings were to be put on there.

Q. They said, if you give us a hazardous chemical you have to give us the warning for the user, the seaman and things like that, don't they?

A. I'm not familiar with what you're talking about when you talk about hazardous chemicals.

Q. Okay. Well, let's look at -- this is 1956. I couldn't find one back in 1943. But it says, Uniform labeling program for hazardous industrial chemicals and materials. You see that? I highlighted that part.

A. I see that, yes.

Q. Okay. And down there under scope: This instruction applies to the labeling of all hazardous materials throughout the naval establishment wherever distribution of hazardous chemicals and materials is made to the actual consumer, parentheses, shop, officer, unit. You see that, sir?

A. Yes, sir.

Q. So the Navy didn't prohibit warnings, did it, sir?

A. I think you're talking about hazardous

materials and chemicals.

Q. I'm talking about hazardous materials, yes, sir --

A. Yes, sir.

Q. -- that are known to be used there?

A. In 1956 they were saying that you should warn about hazardous materials and chemicals.

Q. Do you doubt -- I couldn't find archives going back to 1943.

A. Nor could I. Nor could I.

Q. Do you doubt the Navy had a similar requirement in 1943?

A. I don't know whether they had it or not. It's just not known.

Q. Well, we know that Griscom-Russell could certainly have placed its name on its distiller, correct?

A. No, sir. They were required to submit a name plate, but they couldn't place it on.

Q. Well, the name plate was placed on it, was it not?

A. It was placed, but I don't know who placed it, whether it was placed after the insulation was put on.

Q. And this is --

A. And you can see from this -- this photograph if

you hold it at that position that behind it is the insulation.

Q. That's correct.

A. So if it was placed on after the insulation was placed on. So they supplied the name plate, but they did not put it on.

Q. Exactly. Griscom-Russell printed or made this name plate, gave it to the Navy and after the insulation was put on this was placed over the top of it, correct, sir?

A. That's correct.

Q. And Griscom-Russell wrote all of that material right there?

A. According to the specifications and requirements for name plates on pieces of equipment. The Navy specified how those name plates were to be written.

Q. The Navy told them that they had to say Griscom-Russell Company, Massillon, Ohio, licensed by Bethlehem Steel. The Navy told them they had to say all of that or they just said that?

A. They were allowed to put the name of their manufacturing plant on it.

Q. And they were allowed to put information about hazardous materials on there too, were they not, sir?

A. I don't know that to be so.
Q. You don't know?
A. I think they controlled what was to be put on there and hazardous warnings would have been controlled by the Navy.
Q. You don't know that? Thank you, sir. That's all the questions I have.
*MR. SHEFT:* One question, if I may, your Honor.

**REDIRECT EXAMINATION**

*BY MR. SHEFT*
Q. The engine compartments on the ship were watertight, weren't they?
A. Yes, sir, they were.
Q. Were they also airtight?
A. Between compartments they were, but they certainly weren't with regard to the -- to the atmosphere. They had to be vigorously ventilated and they did that by drawing in fresh air and exhausting -- exhausting engine room air.
Q. Was that done continuously?
A. It had been to be because it was very hot in the engine room. All of that steam equipment and then the ship would be operating in the tropics. It was not air conditioned. So they would have to supply a huge

# EXHIBIT E

CaseyGerry

CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD LLP

110 Laurel Street, San Diego, CA 92101-1419
Tel (619) 238-1811 Fax (619) 544-9232

David S. Casey, Jr.
Frederick Schenk
Robert J. Francavilla
Gayle M. Blatt
Thomas D. Penfield
Thomas D. Luneau
Jeremy K. Robinson
Wendy M. Behan
Juan Ordaz
Jessica E. Klarer

*of Counsel*
T. Michael Reed
Scott C. Cummins
Mitchel Olson MD, JD

Richard Westbrook
1944-1982

David S. Casey, Sr.
1913-2003
President,
California State Bar, 1975

Richard F. Gerry
1924-2004
President,
Association of Trial Lawyers of America, 1982

North County Office
(760) 743-8448

**VIA FACSIMILE AND U.S. MAIL**

December 19, 2007

Thomas Moses, Esq.
Brydon Hugo & Parker
135 Main Street, 20th Floor
San Francisco, CA 94105
Fax: (415) 808-0333

Re: Ball v. Union Carbide Corporation, et al.

Dear Mr. Moses:

Pursuant to your conversation with my office today in the above-referenced matter, please be advised that plaintiff's will not voluntarily dismiss Foster Wheeler. Your request for dismissal and threat to remove this case to Federal Court pursuant to the Federal Enclave/Officer theory is without merit

I would like to draw your attention to Judge R. Gary Klausner's ruling in the matter of Elaine Scarbrough v. General Electric Co. On April 18, 2007 wherein the case was remanded back to State Court after defendant General Electric removed it to Federal Court pursuant to the Federal Enclave/Officer theory. The Court ruled that removal was meritless based on this theory.

Additionally, decedent in this matter served aboard the USS DALE which was built with a Foster Wheeler boiler aboard it. Additionally, decedent served as a boiler man and would have had significant exposure to your client's asbestos containing product.

Thank you for your courtesy and cooperation. Should there be any questions, please do not hesitate to call.

Very truly yours,

FREDERICK SCHENK
FS;ad

G:\WPDATA\Cases\Ball.asb\Letters\Foster Wheeler Reply Letter.wpd